

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JILL EDISON, Individually and On Behalf of All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| TEVA PHARMACEUTICAL INDUSTRIES LIMITED, PHILLIP FROST, EYAL DESHEH, and JEREMY LEVIN, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

Case No.

CLASS ACTION

COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

## CLASS ACTION COMPLAINT

Plaintiff Jill Edison ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the public documents regarding Teva Pharmaceutical Industries Limited ("Teva" or the "Company"), conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teva, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Teva securities between January 1, 2012 and October 29,

2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Teva is a leading global pharmaceutical company that develops, produces and markets generic drugs as well as specialty pharmaceuticals and active pharmaceutical ingredients. Headquartered in Israel, Teva is the world's leading generic drug maker, with a global product portfolio of more than 1,000 molecules and a direct presence in about 60 countries. Teva's branded businesses focus on CNS, oncology, pain, respiratory and women's health therapeutic areas as well as biologics. Teva currently employs approximately 46,000 people around the world and reached $20.3 billion in net revenues in 2012.

3.      On January 1, 2012, Defendant Phillip Frost ("Frost"), the chairman of Teva's board of directors ("Board"), announced that Shlomo Yanai was retiring as the Company's CEO and President, and that the Board had named Defendant Dr. Jeremy Levin ("Levin"), a former senior executive at Bristol-Myers Squibb, to replace Yanai in those positions. Levin formally commenced his tenure as Teva's CEO on May 9, 2012.

4.      In December 2012, Levin and his management team announced a five-year cost cutting program projected to help Teva achieve annual cost savings of $1.5 billion to $2 billion by 2018 (the "Cost Cutting Program").

5.      On October 10, 2013, Teva announced an acceleration of the Cost Cutting Program under which it would lay off 5,000 workers worldwide in 2014, including about 800 employees in Israel.

6.      On October 16, 2013, the press reported that the planned layoffs in Israel had generated a public uproar. One member of Israel's parliament was quoted as stating that Teva's

planned layoffs were "an act of cannibalism" in light of the tax breaks and subsidies that Teva had long enjoyed in Israel.

7.     On October 28, 2013, Channel 2 television in Israel quoted unnamed sources as indicating that Levin was considering resigning due to strong differences of opinion between himself and Frost concerning execution of Teva's strategy, including how to handle the planned layoffs in Israel. Among other things, Channel 2 cited a letter from certain senior executives to the Board stating that "*the lack of unity among the board of directors and CEO hurts our ability to make the necessary changes,*" and urging the Board to "*reconsider its intervention in the daily course of business that we believe has become common in recent months and prevents management from being able to manage Teva effectively.*"

8.     Reports of the internal discord at Teva drew strong reactions from Teva analysts. Channel 2 quoted Ronny Gal, an analyst at Sanford C. Bernstein & Co. in New York as stating: "[a] disagreement within Teva would be a material problem right now. Management reshuffle or simply a distraction caused by infighting would mean Teva will be ineffective right when it needs maximum focus. If this disagreement lingers, we would get more concerned."

9.     Later that day, Levin categorically denied that he was considering resigning because of disagreements with Frost and the Board, and Teva issued a separate statement saying that reports of differences of opinion between Levin and Frost over execution were "baseless." The Company added:

> The company's management has worked to craft and execute its strategy with complete cooperation from the board of directors. All decisions made by the company's management, led by its CEO, have been made with consultation and agreement of the board. The chairman and the CEO conduct regular work meetings and conversations, as is customary.

10. On October 30, 2013, Teva announced that Levin would, in fact, be resigning as CEO and President. In connection with Levin's departure, Frost was quoted as stating that there were differences between the Board and Levin concerning execution of Teva's strategy.

11. Upon the news of Levin's departure, TEVA shares declined 8% from a close of $41.02/share on October 29, 2013, to a close of $37.70/share on October 30, 2013, *erasing over $2.8 billion in market capitalization*.

12. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that there was significant internal discord between the Board and Teva's senior management during the Class Period (and in particular, significant differences between the Chairman of the Board and the CEO) concerning execution of the Company's strategies, including implementation of the critical Cost Cutting Program. As a result of the foregoing, the Company's stock traded at artificially inflated prices during the Class Period.

13. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10 (b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R § 240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Teva's securities are actively traded in this District and many of the acts and practices complained of occurred in substantial part herein.

17.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

<u>**PARTIES**</u>

18.   Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Teva securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the facts in the corrective disclosures made on October 30, 2013.

19.   Defendant Teva is a corporation organized under the laws of Israel, maintaining its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva 4951033 Israel. Teva's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TEVA."

20.   Defendant Phillip Frost ("Frost") has served as Chairman of the Company's Board at all relevant times. Defendant Frost is the Company's largest individual shareholder.

21.   Defendant Eyal Desheh ("Desheh") has served as the Company's Chief Financial Officer at all relevant times. Defendant Desheh currently serves as the Company's Acting President and CEO following the departure of Defendant Levin.

22.   Defendant Jeremy Levin ("Levin") served as the Company's CEO and President during the Class Period. On October 30, 2013, the Company announced that Levin had resigned from those positions.

23.   The defendants referenced above in ¶¶ 20-22 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

24.   Teva is a leading global pharmaceutical company that develops, produces and markets generic drugs as well as specialty pharmaceuticals and active pharmaceutical ingredients. Headquartered in Israel, Teva is the world's leading generic drug maker, with a global product portfolio of more than 1,000 molecules and a direct presence in about 60 countries. Teva's branded businesses focus on CNS, oncology, pain, respiratory and women's health therapeutic areas as well as biologics. Teva currently employs approximately 46,000 people around the world and reached $20.3 billion in net revenues in 2012.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

25.   On January 1, 2012, Defendant Frost announced that Shlomo Yanai was retiring as the Company's CEO and President, and that the Board had named Defendant Levin, a former senior executive at Bristol-Myers Squibb, to replace Yanai in those positions. In connection with the appointment of Levin, the Company issued a press release in which Defendant Frost was quoted as saying:

> Dr. Levin is an exceptionally talented business leader with a deep understanding of the opportunities and challenges of the pharmaceutical industry.  He brings to Teva a wealth of experience and the hands-on skills required to foster the growth of a global pharmaceutical business. As a business leader and as a physician, he is passionately committed to bringing effective treatments to patients, worldwide. His combination of vision, creative energy and an effective team-building management style make him an idealchoice to lead Teva into its next growth phase.

26.   Levin formally commenced his tenure as Teva's CEO on May 9, 2012.

27.   On December 11, 2012, at an investor day event ("Investor Day") in New York City convened by the Company, Teva's senior management presented the Company's vision and strategies for the next several years. Among the pillars of the Company's strategy was the Cost Cutting Program, which was intended to help Teva achieve annual cost savings of $1.5 billion to $2 billion by 2018. In his opening remarks at the Investor Day, Defendant Frost stated:

> *This is an important day for all of us at Teva. It represents the first time that Jeremy Levin, our CEO, will have the opportunity to officially introduce part of the senior staff and to explain our strategy and plans for the company for the next few years, in the context of what Teva has been, how it's been perceived, and where it's going.* How it has evolved from a dynamic generic drug company, under the leadership of a brilliant Chairman, Eli Hurwitz, to a diversified international pharmaceutical company that strives to do the right thing for its investors, employees and above all for the millions of patients around the world who require the medicines that we make.
>
> Last week, the company presented its guidance for the financial results for 2013. *The theme of the presentation was intended to be credibility through transparency. We will continue to emphasize this theme as we go forward. The theme for today, from my point of view, is stability and growth through entrepreneurship, opportunism and execution.*
>
> *We will hear about a broad outline with some detail of a plan to take Teva to another level of achievement. We have a plan; we have a plan that's reasonable and achievable.* But I know, in fact I hope and as you might imagine, there will be opportunities along the way that we can't conceive of today. These may take us in new directions. These are exciting times for Teva. We're ready.
>
> And with that, I'll introduce our CEO, Jeremy Levin.

28.   In his opening remarks, Defendant Levin referred to the "pillars" of the Company's strategy, which included the Cost Cutting Program intended to "realize cost saving opportunities of approximately $1.5 billion to $2 billion." In his final prepared remarks, Defendant Levin stated:

> Ladies and gentlemen, it's been a long afternoon, and I really do appreciate your being here with us. I'd like to just bring us down to what we hear for today. Teva

is a terrific company. It's a company built on a phenomenal past and it's a company with a phenomenal future. I hope today as you've studied and listened to us that you've gained greater visibility on the status of our business, the way we look at it and indeed, the strategy that we're going to adopt for the future starting today.

We have great, strong, fundamental growth platforms. We're going to focus on them. *We have an extremely clear path forward. Each one, every one of the managers and those that sit before you ready to answer your questions and those around the world have a clear path forward. We know what we need to do, we will do it and we'll show you and you'll see it.*

29.   On February 7, 2013, Teva hosted a conference call to discuss the Company's results for the fourth quarter and full year 2012. In his opening remarks, Defendant Levin stated:

Good morning, everyone in the USA and good afternoon for those in Europe and thank you for joining the call today to discuss Teva's fourth quarter and year-end 2012 results. 2012 was a year in which we assessed our business, identified key areas of opportunity and built an important new business strategy. We enter 2013 enthusiastically with a refined business model an expanded and engaged leadership team and a culture, which encourages and rewards innovation. We are constantly of course mindful of our commitment to patients, customers and shareholders and we're optimistic and dedicated to deliver on these commitments.

I'm particularly pleased to announce today that Teva's Board of Directors elected to increase the company's quarterly dividend by 15%. This increase in our dividend reflects the Board's and management's optimism about the future of our business and Teva's commitment to reward our shareholders. Additionally, as you may have noticed we repurchased approximately $0.5 billion of our stock in the fourth quarter for a total of approximately $1.2 billion in 2012.

Overall, we returned over $2 billion or 58% of our free cash flow to our shareholders in 2012 through dividends and share repurchases. Teva remains committed to invest in the future of our company. Today as part of our reshape program announced late last year we are announcing our intention to sell our injectable manufacturing facility in Irvine, California. Our desire is to supply more of our products from our more cost-effective locations thereby beginning to optimize our entire network. We currently have five FDA approved sterile manufacturing sites from which to supply product including our new state-of-the-art facility in Godollo, Hungary. Our goal is to sell the Irvine plant to a buyer with a strategic long-term interest in the facility who will continue to manufacture for Teva as we work towards moving these products other locations in our network.

Looking ahead, we will leverage our strengths, which provide an unprecedented geographical reach, world-class manufacturing and distribution capabilities and

pricing flexibility with a balanced and integrated approach in both generic and patent protected medicines. Teva is and will continue to be an integral part of the global healthcare system.

Today, as we report our fourth quarter and year-end 2012 results we have a stronger, more competitive and differentiated R&D pipeline. This exemplifies our commitment to both short-term and long-term growth. Our strategy emphasizes management of our business for profitability and sustainable profitable growth. We will use an aggressive business development strategy as a key driver to build a robust pipeline and expand and extend our core franchises. In addition, we have a firm commitment to returning shareholder value. *I strongly believe these components provide a platform for Teva's growth in the short term as well over the next decade. With our strategy in place we have a very intense focus on execution, excellence and performance.*

\* \* \*

As we entered 2013, the hard work and diligence to reshape the company has positioned Teva extremely well to bring new medicines to patients in need. And I look forward with great expectation and enthusiasm into 2013 and the years beyond. We believe 2012 results demonstrate a strong and disciplined business focus and are significant accomplishments considering that they were achieved in the midst of extensive planning to reshape the company in uncertain global economy in an ever-shifting healthcare landscape. And while we assembled and integrated a new management team, it's quite obvious to any who see us that the Teva management and organization are energized, focused and excited about Teva's future and the opportunities ahead.

But it's not just the management. I would like to recognize particularly the dedication and contribution of the 46,000 employees around the world who work to reshape Teva. *I'm extremely confident the course we have set is the right one and will yield real value for patients, customers and shareholders while ensuring the long-term sustainable growth of our company.*

30.    On February 12, 2013, Teva filed its annual foreign issuer report for 2012 on Form 20-F ("Annual Report"). In discussing the Company's strategy, the Annual Report stated:

*Following the appointment in mid-2012 of our new Chief Executive Officer, Dr. Jeremy M. Levin, and with the support of our Board of Directors, we undertook a thorough review of our business to improve current performance and best position Teva for the future. This review identified existing strengths, capabilities and opportunities throughout the organization and enabled a deeper understanding of the evolution of the pharmaceutical market and the resulting new opportunities. These findings were used to define a strategy that*

*positions Teva to take advantage of opportunities throughout the global markets where we operate.*

The core principle of our approach is a commitment to tailoring our specialty, generic and OTC medicines to the needs of individual markets and to providing relevant options for patients, physicians and customers. We recognize that fundamental changes are required to meet the changing demands of a global healthcare landscape. We will seek to meet the needs of all of our stakeholders by leveraging our geographic reach, focused specialty medicines portfolio, integrated R&D programs, world-class manufacturing and distribution capabilities and pricing flexibility to achieve a balanced and integrated approach to generic, specialty and OTC medicines.

Our strategy is designed to make Teva the most indispensable medicines company in the world, and consists of six major pillars.

31.    The Annual Report identified the six "pillars" of the Company's strategy as:

- Accelerating our growth platforms

- Extending our global presence

- Executing strategic business development

- Protecting and expanding our core franchise

- Reducing our operating costs

- Developing, retaining and recruiting world-class employees

32.    On May 2, 2013, Teva hosted a conference call to discuss the Company's results for the first quarter of 2013. In his opening remarks, Defendant Levin stated:

> Good morning, everyone and thank you for joining the call today to discuss Teva's first quarter 2013 results.
>
> During my remarks this morning, I will briefly recap the first quarter and more recent highlights and we'll exercise the key milestones related to the implementation of our overall plan and strategy for the company.
>
> *I joined the company as CEO nearly exactly a year ago, May 2012. Since that time, we developed and articulated our global strategy. Most recently in [December], the strategy is based upon six pillars to accelerate growth platforms, extend our global presence, executive on strategic business development, protect and expand our core franchises,*

10

*reduce our operating cost and develop, retain and recruit world-class employees.*

*We are executing vigorously on our strategic plan and are well advanced in many of the efforts to reach our goals.* As a result, I firmly believe that Teva is poised to seize today's opportunities and successfully meet our industry's changing dynamics tomorrow.

\* \* \*

Due to the efforts of the company over the last year, we now have a solid and unique business infrastructure in place. This allows Teva to more effectively leverage its strengths in both, generics and specialty brands through business development. Overall, the actions I have taken during my first year at Teva, underscore my complete commitment to several key areas. The streamlined business through operational discipline, the expansion of the global leadership team with deep expertise and experience, a creative and strategic approach to R&D and aggressive pursuit of business development opportunities that compliment and enhance our core businesses and key therapeutic areas and the management of the organization for profitability and profitable growth.

\* \* \*

I would now like to take a moment to discuss cost management and initial steps that have been take over the past month. This part of the company's overall efficiency and productivity strategy, we have initiated the divestment proceeds for the manufacturing plant in Irvine, California as recently announced. And in addition, this eligible [GI] side will seize operations.

This plant will remain active and productive until it closes in 2017. Additionally, I am very pleased to share with you that Lisa Martin, formerly Head of Global Procurement at Pfizer joined Teva Chief Procurement Officer and will put in place a comprehensive procurement strategy.

Our commitment to cost savings remained a high priority. And, as we've addressed previously, we anticipate most of these savings will be realized between 2014 and 2017. We remain on track with our goals of cost-based improvement.

Before turning the call over to Eyal, who will review Teva's first quarter financial results in more detail, I would like to emphasize that Teva's leadership team is committed to managing the company to generate long-term and sustainable growth in our business. Teva is uniquely positioned

with a broad global footprint in both, generic and branded medicine. Thus we strongly believe there's major competitive advantage.

*It is my belief that over the past year, we've created the strategy that will guide Teva into an exciting future as a leader in both, generics and branded medicines. We are executing vigorously against that strategy. We forward to keeping you informed of our progress.*

33.    On August 1, 2013, Teva hosted a conference call to discuss the Company's results

for the second quarter of 2013. In his opening remarks, Defendant Levin stated:

*The five-year $1.5 billion to $2 billion cost reduction strategy, we announced at the end of 2012, remains on track.* These savings will be used to stabilize our operating margins as well as investing in building long-term business growth.

During the second quarter and first half of 2013, Teva's return of cash to shareholders out of its cash flow from operations was 65% and 53%, respectively, which was distributed to shareholders in the form of dividends and stock repurchases. Teva's board remains committed to delivering shareholder return. I have great confidence in where the company is today and in its future. We continue to execute on our strategy to focus on our generic operations, a core component our business to drive robust momentum in our specialty business to reduce cost structure and to make the right strategic decisions and investments in our business.

We have built a strong and diverse business and a robust pipeline that positions Teva to achieve a high level of performance and growth.

34.    As part of the question-and-answer session on the August 1, 2013 conference call,

Defendant Levin participated in the following exchange:

**Aaron R. Gal - Sanford Bernstein**
The first question is on the cost cut. Then I have a follow-up. Jeremy, I remember from my consulting days, that usually there is a time when we begin implement a program in which you begin to push down kind of like targets for cost cuts through the various business lines and from there to various country managers and line managers. I was wondering as you guys are preparing to execute on your cost cuts, just given as much as how big it is as a percentage of cost structure, where, currently, in the thinking process are you? Do we actually have targets communicated to the different country managers and the different operating line managers?

**Jeremy Levin - President, Chief Executive Officer**

Morning, Ronny. Actually I didn't know that you worked as a consultant, previously. Interesting. *Look, we are completely on track to achieve our goals in this. We have an organization structured. We have communicated down at least one level, two levels now, and we know where we are going, what areas we want to target and how are we going to target them. Let me pass you to Eyal who was intimately involved with me in building the organization and just let me reiterate something else.*

This is not something that is being simply passed out across the company. This is something that is being managed actively by a core team, headed by Erez Israeli, very experienced in this company. So supported by infrastructure and also appropriate, let me use the word, consulting support to make sure that is happens. *There is unanimity across the entire senior management team of how to do this, when to do it and where to do it.*

35.    Thereafter, on the same call, Defendant Levin also participated in the following exchange:

**Jami Rubin - Goldman Sachs**
A couple of questions for you, Jeremy, related to M&A. You have publicly stated that you are going to pursue small-to-mid size deals. I think you said up to $2 billion in oncology, respiratory and CNS, so just a couple of questions around that. *First, is your board completely behind you on that plan?* Second, would you consider going bigger than small-to-mid size? Third, would you consider a deal that would provide you with immediate cash flows as investors wait for the pipeline to materialize? Thanks.

**Jeremy Levin - President, Chief Executive Officer**
*Good morning, Jamie. First of all the board is behind what we are doing.* Secondly, with regard to the types of M&A, you are quite right. We have definitely targeted those areas and we will do what makes strategic and financial sense for the company. As regards, returning cash to the shareholders, let me pass you over to Eyal for that answer.

36.    The statements referenced in ¶¶ 25-35 above were materially false and/or misleading because they misrepresented and failed to disclose that there was significant internal discord between the Board and Teva's senior management during the Class Period (and in particular, significant differences between the Chairman of the Board and the CEO) concerning execution of the Company's strategies, including implementation of the critical Cost Cutting

Program. As a result of the foregoing, the Company's stock traded at artificially inflated prices during the Class Period.

## THE TRUTH BEGINS TO EMERGE

37.   On October 10, 2013, Teva announced an acceleration of the Cost Cutting Program under which it would lay off 5,000 workers worldwide in 2014, including about 800 employees in Israel.

38.   On October 16, 2013, the press reported that the planned layoffs in Israel had generated a public uproar. One member of Israel's parliament was quoted as stating that Teva's planned layoffs were "an act of cannibalism" in light of the tax breaks and subsidies that Teva had long enjoyed in Israel.

39.   On October 28, 2013, Channel 2 television in Israel reported that Frost and Levin had clashed over how to implement Teva's cost-cutting plan (including how to handle the planned layoffs in Israel), and had not met for several weeks. Channel 2 further claimed that Levin was considering resigning due to the strong differences of opinion between himself and Frost concerning execution of Teva's strategy. Among other sources, Channel 2 cited a letter from certain senior executives to the Board stating that "the lack of unity among the board of directors and CEO hurts our ability to make the necessary changes," and urging the Board to "reconsider its intervention in the daily course of business that we believe has become common in recent months and prevents management from being able to manage Teva effectively."

40.   Reports of the internal discord at Teva drew strong reactions from Teva analysts. Channel 2 quoted Ronny Gal, an analyst at Sanford C. Bernstein & Co. in New York as stating: "[a] disagreement within Teva would be a material problem right now. Management reshuffle or

simply a distraction caused by infighting would mean Teva will be ineffective right when it needs maximum focus. If this disagreement lingers, we would get more concerned."

41.   Later that day, Levin categorically denied that he was considering resigning because of disagreements with Frost and the Board, and Teva issued a separate statement saying that reports of differences of opinion between Levin and Frost over execution were "baseless." The Company added:

> The company's management has worked to craft and execute its strategy with complete cooperation from the board of directors. All decisions made by the company's management, led by its CEO, have been made with consultation and agreement of the board. The chairman and the CEO conduct regular work meetings and conversations, as is customary.

42.   On October 30, 2013, Teva announced that Levin would, in fact, be resigning as CEO and President. In connection with Levin's departure, Frost was quoted as stating that there were differences between the Board and Levin concerning execution of Teva's strategy.

43.   Commenting on Levin's resignation, Goldman Sachs' analyst Jami Rubin stated, "[w]e view this news as a significant setback ... as the company's recently implemented strategy to [get] back on a growth path, including recent accelerated cost reduction initiatives, could be called into question."

44.   Upon the news of Levin's departure, TEVA shares declined 8% from a close of $41.02/share on October 29, 2013, to a close of $37.70/share on October 30, 2013, *erasing over $2.8 billion in market capitalization.*

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Teva securities during the Class Period (the "Class"); and were damaged

thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Teva securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Teva;

- whether the Individual Defendants caused Teva to issue false and misleading statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Teva securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Teva securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Teva securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## LOSS CAUSATION

53.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

54.    During the Class Period, Plaintiff and the Class purchased Teva securties at artificially inflated prices and were damaged thereby.  The price of Teva's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

55.    Defendants acted with scienter because they: (i) knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

56.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Teva, their control over, receipt and/or modification of Teva's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning

18

Teva cost-cutting program and disagreements between the Company's management and Board, participated in the fraudulent scheme alleged herein.

57.    Defendants knew, or recklessly disregarded, that despite the Company's public representations, the Company's management and Board differed sharply over the cost-cutting program, as well as the implementation of that program.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

58.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under Section 10(b) by the SEC.

60.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Teva securities; and (iii) cause Plaintiff and other members of the Class to purchase Teva securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

61.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Teva securities and options.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Teva's business, management and operations.

62.   By virtue of their positions at Teva, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.   As the senior managers and/or directors of Teva, the Individual Defendants had knowledge of the details of Teva's internal affairs.

64.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Teva. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Teva's businesses, operations, and management. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Teva securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Teva's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Teva securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

65. During the Class Period, Teva securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Teva securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Teva securities were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Teva securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.   As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the**
**Exchange Act Against The Individual Defendants)**

68.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.   During the Class Period, the Individual Defendants participated in the operation and management of Teva, and conducted and participated, directly and indirectly, in the conduct of Teva's business affairs.

70.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Teva's business and operations, and to correct promptly any public statements issued by Teva which had become materially false or misleading.

71.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various statements, reports, press releases and public filings which Teva disseminated in the marketplace during the Class Period concerning Teva's business, operation and management.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Teva to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Teva within the meaning of Section 20(a) of the Exchange Act.   In this capacity,

they participated in the unlawful conduct alleged which artificially inflated the market price of Teva securities.

72.   Each of the Individual Defendants, therefore, acted as a controlling person of Teva. By reason of their senior management positions and/or being directors of Teva, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Teva to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Teva and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Teva.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 18, 2013

RIGRODSKY & LONG, P.A.

By:

Seth D. Rigrodsky
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY  11530
Email:  sdr@rigrodskylong.com
          tjm@rigrodskylong.com
Tel.:  (516) 683-3516
Fax:  (302) 654-7530


**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
Ethan D. Wohl
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Fax: (212) 758-4004

*Counsel for Plaintiff*